STEPHANIE YONEKURA
Acting United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
ANTHONY J. LEWIS (Cal. Bar No. 231825)
AARON LEWIS (Cal. Bar No. 284244)
Assistant United States Attorneys
National Security Section
1300 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-1786/4586
Facsimile: (213) 894-6436
E-mail: anthony.lewis@usdoj.gov
aaron.lewis@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED-SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT
AUG 2 7 2014
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>KEITH PRESTON GARTENLAUB,<br>Defendant. | No. SA 14-320M<br><br>GOVERNMENT'S BRIEF IN SUPPORT OF REQUEST FOR DETENTION OF DEFENDANT KEITH PRESTON GARTENLAUB; DECLARATION OF ALEX YOO |

Plaintiff United States of America, by and through its counsel of record, the Office of the United States Attorney for the Central District of California and Assistant United States Attorneys Anthony J. Lewis and Aaron Lewis, hereby files the Government's Brief in Support of Request for Detention of Defendant Keith Preston Gartenlaub (the "Detention Brief").

///

This Detention Brief is based upon the attached memorandum of points and authorities, the declaration of Alex Yoo, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: August 27, 2014

Respectfully submitted,

STEPHANIE YONEKURA
Acting United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

ANTHONY J. LEWIS
AARON LEWIS
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS


DESCRIPTION PAGE

TABLE OF AUTHORITIES ........ ii

MEMORANDUM OF POINTS AND AUTHORITIES ........ 1

I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 2

III. ARGUMENT ........ 4

A. The Bail Reform Act ........ 4

B. Pretrial Detention is Warranted Under the § 3142(g) Factors ........ 5

1. The Nature and Circumstances of the Offense Charged ........ 5

2. The Weight of the Evidence ........ 7

3. The History and Characteristics of Defendant ........ 8

4. The Nature and Seriousness of the Danger Posed by Defendant's Release ........ 11

IV. CONCLUSION ........ 12

# TABLE OF AUTHORITIES

DESCRIPTION PAGE

**FEDERAL CASES**

Osborne v. Ohio, 495 U.S. 103, 110 S. Ct. 1691, 109 L. Ed. 2d 98 (1990) ........ 5

United States v. Boos, 127 F.3d 1207 (9th Cir. 1997) .................................. 12

United States v. Hir, 517 F.3d 1081 (9th Cir. 2008) .................................. 11

United States v. Koenig, 912 F.2d 1190 (9th Cir. 1990) ............................ 9, 10

United States v. Motamedi, 767 F.2d 1403 (9th Cir. 1985) ............................ 4, 5

United States v. Paroline, 134 S.Ct. 1710 (2014) ........................................ 5

United States v. Trosper, 809 F.2d 1107 (5th Cir. 1987) ............................ 9, 11

United States v. Winsor, 785 F.2d 755 (9th Cir. 1986) ................................ 5, 8

**FEDERAL STATUTES**

18 U.S.C. § 2252A(a)(5)(B) ................................... 1, 5, 7

18 U.S.C. § 3142 ........................................ 1, 4, 5, 12

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

On August 27, 2014, Special Agents of the Federal Bureau of Investigation arrested Keith Preston Gartenlaub ("defendant") for possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Because there is no condition or combination of conditions that would mitigate the significant risk that defendant will flee the United States rather than face trial, this Court should grant the government's request for pre-trial detention under 18 U.S.C. § 3142.

As described more fully below, defendant has a powerful motive to flee the United States rather than face trial. He also has the relationships, knowledge, and means to do so successfully. Defendant's wife was born in China, and her family, which defendant has described as "well connected," continues to live there. Until recently, defendant and his wife also owned real property in China and had since 2008. They have been in telephone contact with telephone numbers registered in China and defendant has traveled to China—a nation that does not have an extradition treaty with the United States—three times this year alone. Defendant has few remaining ties to this community. His employment in this District will likely be terminated, he now owns no property in the Central District of California, and his lease is scheduled to expire at the end of October.

In addition to defendant's connections to China, he also has the financial means to flee and sustain himself. Defendant converted more than $200,000 of the proceeds from the sale of his home in February 2014 to a cashier's check in his wife's name. In 2008,

defendant used $30,000 of his retirement account to purchase real estate in China, property that he recently sold.

Viewed in light of the applicable sentencing range if defendant were convicted—108 to 135 months—these facts demonstrate that defendant has the capacity to flee, that he could live abroad indefinitely, and that there is no combination of pre-trial release conditions that would reasonably assure defendant's presence at future proceedings. Pretrial detention is required.

## II. STATEMENT OF FACTS

Defendant has been arrested and a complaint is being filed charging defendant with possession of child pornography in violation of Title 18, United States Code, Section 2252A(a)(5)(B).

As set forth in the Declaration of Alex Yoo ("Decl."),[1] defendant possesses the means and incentive to flee:

- Defendant maintains fourteen bank accounts, with balances totaling $34,624 (Decl. ¶ 2.);

---

[1] The government may proceed by way of a proffer in a hearing on defendant's detention. E.g., Winsor, 785 F.2d at 757 (ruling that without a proffer from defendant as to why the government's proffer was incorrect, "the magistrate was not required to allow Winsor to cross-examine the investigators and police officers"); United States v. Cabrera-Ortigoza, 196 F.R.D. 571 (S.D. Cal. 2000) (ruling government may proceed based on proffer without a counter-proffer from defendant in "reasonable detail" and "credibly challenging the correctness of the government's proffer"); see also United States v. Bibbs, 488 F. Supp. 2d 925, 926 (N.D. Cal. 2007) ("Nothing in Crawford requires or even suggests that it be applied to a detention hearing under the Bail Reform Act, which has never been considered to be part of the trial.").

Here, the government has submitted a sworn declaration, which contains hearsay that can be considered by the Court in a hearing to determine if defendant should be detained. Fed. R. Evid. 1101(d)(e) (providing that the Federal Rules of Evidence "do not apply to . . . miscellaneous hearings such as . . . considering whether to release on bail or otherwise"); Winsor, 785 F.2d at 757 ("[T]he government may proceed in a detention hearing by proffer or hearsay.").

- Defendant sold his residence, the real estate where he and his wife lived, in February 2014, and subsequently transferred $200,000 of the proceeds from that sale into a cashier's check in his wife's name that she deposited. (Decl. ¶¶ 6-7.);
- Defendant previously used $30,000 from his retirement account to fund the purchase of an apartment in China with his wife. (Decl. ¶ 9.);
- Defendant has since sold that real estate, purchased other real property in China, and has recently sold that real estate as well. (Decl. ¶ 12.);
- Defendant has traveled to China at least six times since 2006, and has traveled elsewhere abroad. (Decl. ¶ 14.);
- Defendant characterized his wife's family in China as being well-connected. (Decl. ¶ 11.a.);
- Defendant and his wife have been in contact dozens of times with telephone numbers based in China. (Decl. ¶ 16.);
- Defendant's wife has deposited $38,084 in cash in to a bank account associated with her business between July 2, 2013 and February 26, 2014 (Decl. ¶ 3.);
- Defendant has a brother and father, neither of whom resides in the Central District of California. (Decl. ¶ 17);
- Defendant and his wife now live in a temporary rental that they have rented through October 2014. (Decl. ¶ 18); and
- Defendant has currently been seeking other employment abroad in Shanghai. (Decl. ¶¶ 19-21.).

## III. ARGUMENT

### A. The Bail Reform Act

Under the Bail Reform Act of 1984 ("the Act") this Court may order defendant's pretrial detention if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). In this case, the government seeks defendant's pre-trial detention solely because he is a significant flight risk and no combination of release conditions will reasonably assure his appearance at future proceedings in this case. The government acknowledges that there are pre-trial release conditions that would "reasonably assure . . . the safety of any other person and the community," and therefore is not seeking to detain defendant as a danger to the community. Detention is appropriate in this case if the government proves by a preponderance of the evidence that defendant is a flight risk. United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985).

The government is entitled to a hearing on this issue if, as in this case, the government requests a hearing and the case involves "any felony that is not otherwise a crime of violence that involves a minor victim," or "a serious risk that [the defendant] will flee." 18 U.S.C. §§ 3142(f)(1)(E), (2)(A). Four factors are relevant to the Court's consideration of whether pretrial detention is appropriate: (1) the nature and seriousness of the offense charged, under 18 U.S.C. § 3142(g)(1); (2) the weight of the evidence against defendant, under 18 U.S.C. § 3142(g)(2); (3) the defendant's history and characteristics, under 18 U.S.C. § 3142(g)(3); and, (4) the nature and seriousness of the danger to any person or to the

community that would be posed by the defendant's release, under 18 U.S.C. § 3142(g)(4). See United States v. Winsor, 785 F.2d 755 (9th Cir. 1986); Motamedi, 767 F.2d at 1407.

**B. Pretrial Detention is Warranted Under the § 3142(g) Factors**

Each of the factors enumerated in 18 U.S.C. § 3142(g) supports the government's request for pretrial detention.

1. The Nature and Circumstances of the Offense Charged

The United States has charged defendant with possession of child pornography, in violation of 18 U.S.C § 2252(A)(a)(5)(B). The nature and circumstances of this offense warrant defendant's pre-trial detention to reasonably assure his appearance at future proceedings in this case. This is particularly so because defendant's possession of child pornography necessarily involved minor victims, a category of criminal conduct expressly referenced in 18 U.S.C. § 3142(g)(1), and, as the Supreme Court recently recognized, encouraged the production of child pornography:

> The demand for child pornography harms children in part because it drives production, which involves child abuse. The harms caused by child pornography, however, are still more extensive because child pornography is "a permanent record" of the depicted child's abuse, and "the harm to the child is exacerbated by [its] circulation." Because child pornography is now traded with ease on the Internet, "the number of still images and videos memorializing the sexual assault and other sexual exploitation of children, many very young in age, has grown exponentially."

United States v. Paroline, 134 S.Ct. 1710, 1716-17 (2014). The charged offense necessarily encourages the continued sexual abuse of children, thereby perpetuating their suffering. See Osborne v. Ohio, 495 U.S. 103, 11, 110 S. Ct. 1691, 109 L. Ed. 2d 98 (1990) ("The pornography's continued existence causes the child victims continuing harm by haunting the children in years to come. The . . . ban on

possession . . . encourages the possessors of these materials to destroy them.") (citations omitted). In light of the Supreme Court's recognition that simply possessing child pornography harms children by encouraging the production of child pornography, detention is warranted to ensure that defendant is unable to view, receive, or transmit additional child pornography pending trial. Moreover, the inherently serious nature of the charged offense, as well as the likely consequences of a conviction on defendant's relationships with his friends, colleagues, and family, produces a powerful incentive for defendant to flee the United States to China. So too does the lengthy custodial sentence defendant would face if convicted.

Based on the facts alleged in the criminal complaint, defendant faces a sentencing range of 108-135 months based on an adjusted offense level of 31 and a criminal history category of I, calculated using the following provisions of the Sentencing Guidelines:

| | | |
|---|---|---|
| Base Offense Level: | 18 | [U.S.S.G. § 2G2.2(a)(1)] |
| <u>Specific Offense Characteristics</u> | | |
| Prepubescent Minors: | +2 | [U.S.S.G. § 2G2.2(b)(2)] |
| Sadistic Material: | +4 | [U.S.S.G. § 2G2.2(b)(4)] |
| Use of a Computer: | +2 | [U.S.S.G. § 2G2.2(b)(6)] |
| More than 600 images: | +5 | [U.S.S.G. § 2G2.2(b)(7)(D)] |

Using just the low-end of the likely applicable Guidelines range, defendant thus faces an approximately nine-year term of incarceration upon conviction. The length of this sentence produces an additional powerful motivation for defendant to flee, particularly to China a nation that does not have an extradition relationship with the United States. Given the serious nature of the charged offense, the likely penalty, and the vital importance of preventing additional

consumption of child pornography by defendant, pre-trial detention is warranted.

2. The Weight of the Evidence

The evidence of defendant's guilt is all but overwhelming. As described more fully in the criminal complaint, the government has copies of the child pornography stored on two of defendant's computers. The evidence contained in these copies proves each of the elements that compose the charged offense.[2] The government has already determined that some of the videos in defendant's collection contained images of identified minor victims, and that the video files containing these depictions must have traveled in interstate or foreign commerce in order to be found on hard drives located in the Central District of California. (Complaint Affidavit ¶¶ 10-12). Moreover, some of the videos in defendant's collection depict children under ten years of age being raped by adult men, leaving no doubt either that defendant knew that these depictions showed minors engaged in sexually explicit conduct or that the production of these videos involved the use of a minor in sexually explicit conduct. (Complaint Affidavit ¶¶ 10.a-h).

---

[2] The elements of possession of child pornography in violation of 18 U.S.C. § 2252(A)(a)(5)(B) are: (1) defendant knowingly possessed matters which the defendant knew contained visual depictions of minors engaged in sexually explicit conduct; (2) defendant knew each visual depiction contained in the matters showed minors engaged in sexually explicit conduct; (3) defendant knew that production of such visual depictions involved use of a minor in sexually explicit conduct; and, (4) each visual depiction had been either (a) mailed, (b) shipped/transported using any means or facility of interstate or foreign commerce or in or affecting interstate and foreign commerce, by any means, including by computer, or (c) produced using material that had been mailed or shipped/transported in or affecting interstate or foreign commerce by any means, including computer. See Ninth Circuit Model Jury Instruction 8.185 (2010 ed.)

Likewise, the evidence obtained by the government proves that defendant knowingly possessed the collection of child pornography stored on computers he used, computers that were found in his home. In addition to child pornography, defendant also collected adult pornography. (Complaint Affidavit ¶¶ 25-27). He stored these files in folders that were buried deep within other folders, often within folders that had names corresponding to their contents, indicating that he had viewed them and therefore possessed them knowingly. (Complaint ¶¶ 29-31).

Although the Ninth Circuit has held consistently that courts should afford the least weight to this factor, see Winsor, 785 F.2d at 757, here the strength of the government's proof amplifies the risk that defendant will flee to avoid the likely consequences of going to trial. Consequently, the weight of the evidence warrants defendant's pre-trial detention.

3. The History and Characteristics of Defendant

Defendant's history and characteristics weigh heavily in favor of pre-trial detention. Although defendant has lived in the Central District of California for many years, he has few concrete ties to this community now. Defendant's most significant personal relationship is with his wife, a woman born in China who has significant family ties to that country. Indeed, defendant traveled to China as recently as June of 2014. This was the sixth trip that defendant took to China since 2006. In an interview with F.B.I. special agents in February 2013, defendant described his wife's family as "well-connected" in China. Defendant and his wife have placed a total of 86 calls to telephone numbers registered in China between January 1, 2014 and August 21, 2014.

Neither do defendant's relationships with the members of his own family tie him to this community. Although defendant's brother and father live in the United States, they reside in other districts and there is no indication that they could ensure defendant's continued presence in this country pending trial. See United States v. Koenig, 912 F.2d 1190, 1193 (9th Cir. 1990) ("His parents have offered to put up a bond, but there is reason to believe that his relationship with his parents is not a close one and that the bond would not assure his appearance."); United States v. Trosper, 809 F.2d 1107, 1110 (5th Cir. 1987) (noting that family ties did not "demonstrate relationships wherein the family members had some control, either physical or emotional, over [defendant's] actions," nor that they "could or would constrain [defendant's] appearance at trial").

Defendant's most significant link to this community was his employment with a prominent corporation that has a longstanding presence in this judicial district. But defendant is not likely to maintain his employment working on sensitive military matters having been charged with a federal felony. Even if defendant's employer were willing to retain him, however, defendant has recently searched for other employment, in Shangahi, suggesting that his current job is not sufficiently important to prevent him from fleeing the United States.

Similarly, there is no property interest in this judicial district that would compel defendant to remain here and face the charge pending against him. Defendant no longer owns a home in this judicial district, having sold the previous residence that he shared with his wife in February 2014. Until his arrest, defendant and his wife lived in a house that they rented; the lease is scheduled to end

in October 2014. Until recently, defendant and his wife did, however, own an apartment in China. According to a letter defendant wrote in 2008, he and his wife jointly bought an apartment in Kunshan, which he said was an investment property. In the same letter, defendant noted that his wife's family had purchased at least one additional apartment in the same complex. Although defendant told F.B.I. agents on August 25, 2014, that he and his wife had recently sold two properties in China with the intention of purchasing a home in Southern California, defendant has a demonstrated ability to purchase and dispose of property in China, an ability that could aid his flight from the United States to avoid prosecution. Furthermore, the proceeds of that sale could sustain defendant in his flight.

On balance there is far more tying defendant to China—a country from which the United States could not extradite him—than there is tying him to the United States. Kouyoumdjian, 601 F. Supp. at 1512 ("[G]iven the state of affairs in Lebanon, extradition would likely be impossible were defendant to flee."). Moreover, defendant's extensive contacts with China, including his "well-connected" in-laws and his admitted purchases and sales of real property in China, demonstrate that defendant has the capacity to do what few other defendants can—flee the United States and live abroad indefinitely, free from the risks of extradition, conviction, and incarceration. See United States v. Koenig, 912 F.2d 1190, 1193 (9th Cir. 1990) (relying in part on "foreign contacts" as basis for affirming district court's order of detention).

In addition—critically—defendant has significant, liquid assets in excess of $200,000 that he could use to flee the United

defendant's continued consumption of child pornography pending trial would further harm the children depicted in the videos composing defendant's collection. The Ninth Circuit has explicitly recognized that the victims of child pornography are the sexually exploited children depicted in the images. United States v. Boos, 127 F.3d 1207 (9th Cir. 1997). In rejecting a defendant's argument that the only victim of his child pornography trading was society in general, the court found that the primary victims of defendant's criminal conduct were the children depicted in the images:

> After all it was the children depicted -- and not society at large -- who were acted on and adversely affected, who oftentimes were forced to participate in the production of the pornography in which [defendant] traded, who were injured (both physically and psychologically) as a result of [defendant]'s patronage of the porn industry, who were sacrificed to satisfy [defendant]'s curiosities, who were subjected to the cruelest form of oppression, hardship, and mistreatment at the hands of pornography producers and photographers, and whose lives were quite possibly destroyed in the process.

Id. at 1210. Although one of the factors under 18 U.S.C. § 3142(g), the evidence set forth in the declaration and affidavit in support of the complaint do not manifest an immediate danger in terms of the library of child pornography possessed, but his creation and amassing of it has clearly caused harm to the victims.

Regardless of the danger presented, for the reasons set forth above, defendant has the means and incentive to flee, and his appearance cannot be assured by any combination of conditions while he is released.

**IV. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court order defendant detained pending trial.

DECLARATION OF ALEX S. YOO

I, Alex S. Yoo, declare as follows:

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation. I have knowledge of the facts set forth herein and could and would testify to those facts fully and truthfully if called and sworn as a witness.

**A. Account Balances and Assets**

2. I have reviewed records from Bank of America, First Bank, JP Morgan Chase, Navy Federal Credit Union (Navy FCU), TD Ameritrade, and USAA Bank, as well as a summary of those documents prepared by a financial analyst, and have also discussed these records with another Special Agent and with an FBI Staff Operations Specialist. From those sources, I learned that over the last six years, Keith Gartenlaub (as a sole or joint accountholder), his wife, or her business have maintained at least 23 bank accounts, certificates of deposit, and investment accounts at financial institutions in the United States. Among those accounts that are still open are:

a. Two Bank of America accounts with balances of $24,383.27 and $2,730.20 respectively as of June 9, 2014, and one Bank of America account with a balance of $1,036.49 as of June 30, 2014.

b. A First Bank account with a balance of $3,641.23 as of February 28, 2014.

c. A TD Ameritrade account with a balance of $2,832.85 as of March 31, 2013.

d. In addition to these accounts with a total balance of $34,624.04, Gartenlaub also maintains at least nine more accounts

with balances between $0 and $513.89, which balances were current as of dates between December 31, 2013 and June 9, 2014. Gartenlaub was also an accountholder on nine additional accounts maintained at these institutions that have since been closed between 2008 and 2013.

3. I have also reviewed JP Morgan Chase and First Bank records associated with Gartenlaub's wife's business--which appears to offer antiques for sale--and learned that a total of $38,084 was deposited in cash between July 2, 2013 and February 26, 2014 in amounts ranging from $20 to $9,045, including specifically cash deposits in the amounts of $9,045, $9,000, $3,000, $2,000, $1,940, $1,200, and three in the amount of $1,000.

**B. Inbound and Outbound Wire Transfers with China**

4. I have also reviewed records related to those accounts and to transfers processed by the Fedwire Funds Transfer System, which maintains records of international wire transfers, as well as a summary of those records prepared by a financial analyst. From those sources, I learned:

a. On February 11, 2014, one of the accounts maintained by Gartenlaub and his wife at First Bank received $9,988 from an incoming wire that was sent from an identified person in Shanghai, China, and the beneficiary was identified as the name of Gartenlaub's wife's business that appears to sell antiques. Although the originating bank was not identified, the ABA routing number of the sender was associated with Bank of China in New York, based on a search of that routing number in publicly available records.

b. On November 3, 2009, a wire transfer of $25,000 was sent from the Bank of America account held by Gartenlaub and his

wife. The beneficiary listed was Gartenlaub's wife at an account maintained at Industrial and Commercial Bank of China ("ICBC"). Records and entries of subsequent transactions show this transfer was reversed, potentially because the beneficiary's account number had not been correctly entered, and two additional transfers in the amounts of $15,000 and $10,000 were sent that also identified Gartenlaub's wife as the beneficiary. Above the line of the wire record that identified Gartenlaub's wife as a beneficiary at ICBC were special instructions that stated "VIP CUSTOMER."

c. On August 26, 2009, one of the accounts maintained by Gartenlaub and his wife at Bank of America received $4,982 from an incoming wire transfer that originated from an identified person's account at ICBC. That transfer partially funded a much larger cashier's check related to the purchase of Gartenlaub's prior residence in Irvine, California.

d. On September 11, 2008, Tess Gartenlaub wired $200 to Shi Hai Yi of Shanghai China with no address listed. The funds were deposited into an account at ICBC.

5. I have also reviewed e-mail correspondence obtained from an e-mail search warrant showing that Gartenlaub's wife had been attempting to wire funds from an account she maintained at East West Bank to her mother in Shanghai in June 2007.

**C. Liquidation of Assets**

6. I have also reviewed bank records provided by Bank of America and the results of a database showing the purchase and sale of real estate. From those sources, I learned that on March 7, 2014, the account maintained by Gartenlaub and his wife received

$246,146.91 that originated from an escrow company at the time when Gartenlaub and his wife sold their residence in Irvine in February 2014, which I learned was sold for over $600,000 and which had been burdened by a loan of over $400,000.

7. Subsequently, on April 15, 2014, Gartenlaub's wife made a $200,000 withdrawal and purchased a Bank of America cashier's check made payable to herself in that amount. On the same date, the Bank of America cashier's check was deposited into a savings account at Mega Bank. I have not reviewed records showing whether the funds remained there or not.

**D. Gartenlaub's Family Connections and Sale of Real Estate in China**

8. I have reviewed a "Questionnaire for National Security Positions" regarding Keith Gartenlaub that reports that Tess Gartenlaub was born in Shanghai, China.

9. I have reviewed documentation that Gartenlaub submitted to his employer regarding the purpose of his travel and activities that occurred during his foreign travel. In one such letter maintained by Gartenlaub's employer that appeared to be written by Gartenlaub, Gartenlaub reported that he traveled to China in June 2008 with his wife and that he and his wife completed the purchase of an apartment in Kunshan, China on which she had put a down payment before they were married. Based on where this letter appeared among other records maintained by Gartenlaub's employer, the letter appeared to be written near that time. Gartenlaub wrote that he had taken a loan of $30,000 out of his "401k account" in order to pay back his father, who had loaned the $30,000 to pay the cost for completing the purchase of the apartment. According to the letter, the apartment

was initially in the name of Gartenlaub's wife's father and aunt due to "residency requirements for purchasing property." According to the letter, the apartment was purchased for investment purposes, Gartenlaub and his wife "have no firm long-term plans for this property and are looking at it as an investment," and they planned to renovate it, rent it out, and have it managed by Gartenlaub's wife's family, who also bought property in the same complex.

10. I have reviewed an e-mail that I learned from another FBI agent was obtained pursuant to a search warrant. That e-mail showed that Gartenlaub wrote his wife with a subject line of "paperwork" and asked his wife: "Should we put in the China property as an asset since we still have some payments left on the loan?"

11. I have reviewed an FBI report of the interview of Gartenlaub on February 22, 2013. In that interview, Gartenlaub said the following:

a. Gartenlaub stated he never had to worry about his security while traveling in China because his wife's family is "well connected."

b. Gartenlaub sought to travel to China because his wife was Chinese, but his employer recommended that he not travel to China anymore.

12. I learned from an FBI agent who interviewed Gartenlaub on August 25, 2014 that Gartenlaub said during the interview that he and his wife had first purchased one piece of real estate in China, sold it to purchase another, and that they had recently sold that second piece of real estate in China. Gartenlaub did not say how much he had sold it for.

**E. Gartenlaub's Travel to and Telephone Contact with China**

13. I have also reviewed a summary prepared by a security officer at Gartenlaub's employer in 2013. According to that officer:

a. Gartenlaub would travel to China and visit family there.

b. Gartenlaub had said he "owned property in China (an apartment, as I recall)."

c. Gartenlaub "always felt he was above the rules."

d. Gartenlaub had been instructed not to travel to China in one particular instance, and had initially said he already bought tickets and was going to go anyway. Gartenlaub ultimately said he did not travel to China on that instance. (Based on my review of the travel records and my communications with a Staff Operations Specialist described below, I am not aware of evidence indicating that Gartenlaub traveled to China on that instance.)

14. I have reviewed a summary prepared by a Staff Operations Specialist of a government database that records when persons cross the United States border, records maintained by Gartenlaub's employer of Gartenlaub's travel, e-mail messages obtained from a search warrant relating to certain trips Gartenlaub had taken, and a list of travel based on those sources prepared by an analyst. Those records show Gartenlaub has consistently traveled abroad, and often to China. Although sometimes the records maintained in the database only show the immediate airport to which Gartenlaub departed or from which he returned, some of those entries correspond to Gartenlaub's wife's travel or evidence from other sources identified above; for example, in October 2009, database records show Gartenlaub departed for Tokyo,

and returned from Seoul, Republic of Korea, but the database records for Gartenlaub's wife show that she had departed the United States for China during that period of time. According to those sources, I learned that Gartenlaub has taken the following trips outside of the United States:

a. August 2014: three-day cruise to Mexico.

b. May to June 2014: three-week trip to China.

c. April to May 2014: two-week trip to China.

d. January to February 2014: two-week trip to China.

e. May 2012 to June 2012: ten-day trip to Israel.

f. August 2011: one-week trip to Mexico.

g. May to June 2011: ten-day trip to China.

h. October 2009: three-week trip to China.

i. June 2008: eleven-day trip to China.

j. July to August 2006: three-week trip to Thailand.

k. June 2005: one-week trip to Mexico.

l. August 2004: one-week trip to Mexico.

m. June 2004: one-week trip, returning from Jamaica.

n. August 2003: one-week trip to Thailand.

15. Other records show that Gartenlaub crossed the U.S. border via a land crossing, although the complete details of his travel are not known from those records. For example:

a. On April 8, 2012, Gartenlaub entered the United States from Canada at the Peace Arch border crossing near Blaine, Washington.

b. On November 26, 2011, Gartenlaub entered the United States from Canada at the Niagara Falls border crossing.

c. On March 8, 2009, July 20, 2007, June 9, 2007, June 1, 2007, June 18, 2006, and June 5, 2003, Gartenlaub entered the United States from Mexico at the San Ysidro border crossing.

d. On November 30, 2008 and September 21, 2008, Gartenlaub entered the United States from Canada at the Highgate Springs border crossing in Vermont.

16. I have also learned the following from the results of a pen register and trap and trace device obtained from carriers that service the cell phones used by Gartenlaub and by his wife, and from an analyst who has also reviewed those records:

a. Between January 1, 2014 and August 21, 2014, Gartenlaub's cell phone was in contact with telephone numbers based in China eight times.

b. Between January 1, 2014 and April 29, 2014, Gartenlaub's wife's cell phone was in contact with telephone numbers based in China seventy-eight times.

**F. Gartenlaub's Limited Ties to this District**

17. I learned from my discussions with a Staff Operations Specialist and from my review of surveillance logs that Gartenlaub's wife lives with him in Laguna Hills, California. I have also learned from a commercial database that Gartenlaub's father and brother each live outside of California within the United States.

18. In addition to having sold his interest in real property, as noted above in paragraph 6, I have reviewed an e-mail message obtained from Gartenlaub's employer in which Gartenlaub e-mailed his wife in July 2014 about a temporary rental unit that was available from July 2014 until October 2014. Gartenlaub wrote his wife that it

was "good enough while we look." I have learned from my review of surveillance logs and an affidavit in support of a warrant for the search of Gartenlaub's residence that this is the address where Gartenlaub currently resides.

19. I have also reviewed an automated e-mail obtained pursuant to a search warrant that Gartenlaub received in April 2013 from a major global corporation displaying ten job openings that matched Gartenlaub's search terms. Those search terms contained words related to the type of work being sought and were coupled with "AND ShangHai," and all of the job positions sent to Gartenlaub in that e-mail listed a location in Shanghai. I have reviewed at least six other similar e-mails from the same corporation listing different numbers of positions available in Shanghai dating back to October 2012.

20. I have also reviewed an e-mail obtained pursuant to a search warrant that Gartenlaub sent to himself and his wife in which he forwarded a job description and wrote "Another Shanghai job..."

21. I have also reviewed an e-mail obtained pursuant to a search warrant that Gartenlaub received in 2006 from his wife. In that e-mail, Gartenlaub's wife had forwarded Gartenlaub's curriculum vitae to another global corporation in which she wrote that Gartenlaub "seeks an appointment in Asia."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on August 29, 2014.

ALEX S. YOO